IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARCELLE RANEE COCHRANE,                    No. 3:16-cv-01194-HZ

            Plaintiff,

      v.

NANCY A. BERRYHILL, Acting                  OPINION & ORDER
Commissioner of Social Security,

            Defendant.

Laurie B. Mapes
Attorney at Law
P.O. Box 1241
Scappoose, Oregon 97056

      Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Sarah Moum
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

        Attorneys for Defendant

HERNANDEZ, District Judge:

        Plaintiff Marcell Cochrane brings this action seeking judicial review of the

Commissioner's final decision to deny disability insurance benefits (DIB), supplemental security

income (SSI), and disabled widow's benefits (DWB).  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)).  I reverse the Commissioner's decision

and remand for an award of benefits.

PROCEDURAL BACKGROUND

        Plaintiff applied for DIB on November 1, 2011, and for SSI and DWB on September 26,

2013, alleging an onset date in August 2011.  Tr. 160-61, 168-73, 175-77[1].  At the hearing,

Plaintiff amended her alleged onset date to September 1, 2011.  Tr. 69.  Plaintiff's DIB

application was denied initially and on reconsideration.  Tr. 85-110, 114-17.  The other

applications were escalated to the hearing level.  Tr. 11.  On July 17, 2014, Plaintiff appeared,

with counsel, for a hearing before an Administrative Law Judge (ALJ).  Tr. 26-84.  On August

15, 2014, the ALJ found Plaintiff not disabled.  Tr. 8-25.  The Appeals Council denied review.

Tr. 1-5.

/ / /

---

[1]  Her DIB and DWB applications allege an August 21, 2011 onset date while her SSI
application alleges an August 5, 2011 onset date.  Tr. 160, 168, 176.

2 - OPINION & ORDER

## FACTUAL BACKGROUND

Plaintiff alleges disability based on having hepatitis C, bilateral brachial plexopathy, hernia, and pain.  Tr. 198.  At the time of the hearing, she was fifty-three years old.  Tr. 29.  Plaintiff completed seventh grade and has past relevant experience as a housekeeper.  Tr. 199.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 U.S. at 141;

20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  Tr. 13.  Next, at steps two and three, the ALJ determined that Plaintiff has severe impairments of brachial plexus disorder and hepatitis, but that her impairments did not meet or equal, either singly or in combination, a listed impairment.  Tr. 14-16.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except she can only occasionally handle, finger, and feel.  Tr. 16.  She can reach to shoulder level, but not higher.  *Id.*  She is limited to unskilled, repetitive, routine work.  *Id.*  She will be off task five-percent of the time, but would still meet minimum production requirements.  *Id.*  She would be absent from work one time each month.  *Id.*  With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past relevant work.

Tr. 20.  However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist

in significant numbers in the economy such as counter clerk and furniture rental clerk.  *Id.*  Thus,

the ALJ determined that Plaintiff is not disabled.  Tr. 21.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings are based on legal error or are not supported by substantial evidence in

the record as a whole.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal

quotation marks omitted).  The court considers the record as a whole, including both the

evidence that supports and detracts from the Commissioner's decision.  *Id.*; *Lingenfelter v.

Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than

one rational interpretation, the ALJ's decision must be affirmed."  *Vasquez*, 572 F.3d at 591

(internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149,

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the

court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) finding her subjective testimony not credible;

(2) improperly rejecting her treating physician's opinions; (3) failing to include all credited

limitations in the hypothetical presented to the vocational expert (VE); and (4) failing to verify

that the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT).  Based

on these errors, she seeks a reversal and remand for the payment of benefits.

I. Credibility

The ALJ is responsible for determining credibility. *Vasquez*, 572 F.3d at 591. Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors

in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*;

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ initially set forth the appropriate two-step credibility inquiry. Tr. 17. Because he made no express finding of malingering and the record does not support one, his rejection of the severity of Plaintiff's symptoms must be by specific, clear and convincing reasons, supported by substantial evidence in the record. The ALJ gave several reasons in support of his credibility determination which are discussed in more detail below.[2] Plaintiff argues that the ALJ's reasons

---

[2] The ALJ gave six separate reasons in support of his credibility determination. Tr. 18-19. Defendant does not rely on two of them in defending the ALJ's decision. Def. Mem. 7 n.4, ECF 12 (stating the Commissioner does not rely upon the reason Plaintiff quit working or her primary care physician's attempt to taper her from narcotic pain medication in favor of non-narcotic pain medication). Thus, I discuss only the remaining four reasons.

for discrediting her symptom severity testimony are based on a mischaracterization of the record and the failure to address substantial evidence supporting her allegations.

A.  Objective Medical Evidence

First, the ALJ found that several alleged symptoms were not supported by the objective medical evidence.  Tr. 18-19.  He noted the lack of imaging studies or clinical findings consistent with debilitating musculoskeletal pain.  Tr. 18.  He found that the record contained no reports or findings that Plaintiff fell a lot and remarked that no medical provider had prescribed a cane or other assistive device.  *Id.*

As to the cane or assistive device, the record includes statements by Plaintiff's primary care treating physician that Plaintiff's use of a cane, walker, or other assistive device was "medically appropriate."  Tr. 392, 560.  Given that one can purchase a cane without a prescription, the ALJ erred by relying on the lack of one to discredit Plaintiff's allegations.

Regarding the lack of objective medical evidence to substantiate her pain complaints, the law is clear that once there is objective medical evidence on an underlying impairment, "the ALJ may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain."  *Rollins v. Massanari*, 261 F.3d 853, 856, 857 (9th Cir. 2001); *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c).  The primary source of Plaintiff's musculoskeletal pain is her brachial plexus disorder.  The ALJ expressed his doubts about the existence of this impairment at step two, but nonetheless found it to be a severe impairment.  Tr. 14.  As such, he cannot solely rely on the lack of objective medical evidence to find that Plaintiff's symptoms about musculoskeletal pain are not credible.  Once he accepted, even for the purposes of his own opinion, that the brachial plexus disorder was a severe

impairment, he was obligated to carry that determination throughout his opinion.

Furthermore, as Plaintiff points out, the Commissioner previously found her disabled for a ten-year period based on this disorder. *See* Tr. 195 (noting prior DIB claim allowed in January 1994). During the hearing, Plaintiff testified that her injury occurred as a result of laparoscopic surgery she had in 1992. Tr. 40. During that procedure, she was positioned in a way that harmed her brachial plexus, a "network of the anterior branches of the last four cervical and the first thoracic spinal nerves supplying the arm, forearm, and hand." *Taber's Cyclopedic Medical Dictionary* 1807 (21st ed 2005); *see also* http://www.mayoclinic.org/diseases-conditions/brachial-plexus-injury/home/ovc-20127336 (defining brachial plexus as a "network of nerves that sends signals from the spine to the shoulder, arm and hand").

Plaintiff testified that when she woke up from the surgery, she could not move her arms. Over the years, however, with physical therapy and "lots of doctoring," she regained full control of her arms. *Id.* She was still left with a "lot of pain from it, because the nerves will never fully heal once they're damaged." *Id.* She noted she has "a little bit" of reduced range of motion and had weakness at first, but her primary symptom is pain. *Id.* Consistent with this testimony, the Social Security Administration (SSA) found her improved enough after ten years that she no longer qualified for disability. Tr. 63 (Plaintiff testified that Social Security found she had medical improvement).

The administrative record developed in conjunction with her current DIB, SSI, and DWB claims includes no records from her earlier claim. The medical records in support of her current claims begin in 2010. Tr. 283-565. While these records contain no information regarding the

initial diagnosis of brachial plexus disorder, the impairment is noted by Plaintiff's current treating providers to be an "active problem." *E.g.*, Tr. 283 (including disorder on problem list as of December 9, 2011); Tr. 340 (same, December 30, 2011); Tr. 345-46 (reference to pain medication for disorder, February 2012); Tr. 356 (including disorder on active problem list as of February 2012); Tr. 386 (listing disorder on active problem list as of September 2012 and as one of several diagnoses supporting physician's request that Plaintiff be awarded medical disability); Tr. 387-88 (October 2012 repeat request by physician for disability because of several active problems, including brachial plexus disorder); Tr. 476-77 (December 2013 chart note stating brachial plexus injury is the main reason for pain); Tr. 398 (listing disorder on June 2014 problem list). Additionally, pain is a known symptom of the disorder. *See* http://www.mayoclinic.org/diseases-conditions/brachial-plexus-injury/symptoms-causes/dxc-201 27374 (noting severe pain as a symptom of brachial plexus disorder).

Given the history of the injury, the fact that the Commissioner herself previously found it disabling, and that Plaintiff's current treating providers all document it as an ongoing impairment, the ALJ's initial reluctance to accept the brachial plexus disorder as an impairment at all is puzzling. Tr. 14. The ALJ faulted Plaintiff for failing to submit treatment notes with objective findings to substantiate the diagnosis. But, those records were certainly available to the ALJ as part of Plaintiff's earlier disability claim, for which she was awarded disability. Because the ALJ has the duty to fully and fairly develop the record, even when Plaintiff is represented by counsel, *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001), and because these records were available to the ALJ, he should have reviewed the prior SSA record.

Additionally, although the ALJ referred to a lack of clinical findings supporting

debilitating musculoskeletal pain, the ALJ did not cite to specific records in conjunction with this statement. Tr. 18. In its Memorandum, Defendant cites to physical examinations showing no abnormal clinical findings including normal range of motion, no tenderness, and no focal neurological deficits. Def. Resp. 4. Because Plaintiff's testimony was that she has only a little bit of reduced range of motion, the lack of abnormal range of motion findings does not contradict her testimony about pain. Moreover, some of the records cited by Defendant reveal no basis for contradicting Plaintiff's testimony about the pain from her brachial plexus disorder. In one, the examiner noted in regard to Plaintiff's back: "no spinal or CVA tenderness." Tr. 315.[3] Plaintiff's brachial plexus disorder pain complaints are not about her spine, however, so a lack of tenderness there is not inconsistent with pain caused by the disorder. In another of the records cited by Defendant, the reference is to the absence of lower extremity tenderness. Tr. 349. Again, the disorder concerns the arms, hands, and shoulders, not the lower extremities. Finally, the third record cited by Defendant does refer to "negative for joint pain" without specifying a region of the body. Tr. 354. But, this is a single note from an emergency department visit precipitated by palpitations and near fainting. Tr. 353. The same chart note refers to the presence of chronic pain making it ambiguous. *Id.*

As to the objective medical evidence, the ALJ erred by rejecting Plaintiff's testimony because of a lack of prescription for a cane. Furthermore, the ALJ's suggestion that the brachial plexus disorder is not an impairment at all is not well founded. And, once he accepted it as a severe impairment, he cannot rely solely on the lack of objective evidence regarding the impairment as a basis for rejecting Plaintiff's testimony regarding the pain it causes. Finally, the

---

[3] "CVA" refers to cerebrovascular accident. *Taber's* 561. Its use here is unclear.

objective evidence in the record does not undermine Plaintiff's allegations regarding pain from her brachial plexus disorder.

B. Treatment Records

Next, the ALJ found that treatment records did not support Plaintiff's allegations of pain medication side effects such as poor concentration and sleepiness. Tr. 18. And, while there were objective test findings consistent with her hepatitis C diagnosis, the ALJ found that the treatment records did not support her allegations as to the severity of fatigue, diarrhea, or pain related to that impairment. *Id.* He noted that despite complaints of fatigue and diarrhea, Plaintiff reported feeling well in general. *Id.* He also noted that the records showed only intermittent complaints of diarrhea and further, only intermittent reports of fatigue and abdominal pain during her interferon treatment for hepatitis C. *Id.*

I agree with the ALJ that the record shows intermittent reports of diarrhea. *E.g.*, Tr. 312-14 (Nov. 2011 chart note indicating Plaintiff experienced weekly bouts of diarrhea); Tr. 348-49 (Feb. 2012 chart note referencing a single incident of bowel incontinence but no reoccurrence); Tr. 359 (chart note again referring to no reoccurrence of bowel incontinence episode). Thus, the treatment records do not support her testimony that she regularly has bowel accidents, must wear Depends, and has diarrhea episodes many times a day and many days in a week. Tr. 74-75.

However, as to abdominal pain, the record shows regular complaints of abdominal pain with an unclear etiology. Plaintiff saw Dr. Joel Simasko in August 2011 for complaints of bloating in the upper abdomen with tender lumps in the upper end of a right subcostal scar. Tr. 296. She reported this had been getting worse over the previous five months. *Id.* Dr. Simasko diagnosed the problem as an incisional hernia. *Id.* He referred her to general surgery for a hernia

repair. Tr. 298. Plaintiff had the hernia repaired on September 1, 2011, Tr. 285, but she continued to experience nausea. Tr. 299.

In October 2011, she was still having intermittent abdominal pain and though she indicated it was better controlled, she still complained of a sensation of right upper quadrant swelling, even after the hernia repair and a prior gall bladder removal surgery in 2008 or 2009. Tr. 302, 285 (noting date of gall bladder surgery). An October 15, 2011 abdominal ultrasound showed dilatation of the common bile duct, perhaps due to her prior gallbladder surgery or age, but an obstructing stone or other process in the distal duct could not be excluded. Tr. 329-30. In an October 27, 2011 follow-up visit with Dr. Aileen Chang, Plaintiff reported having experienced abdominal problems for a few years with pain resolving only temporarily after gallbladder and hernia repair surgeries. Tr. 306. She also reported experiencing intermittent diarrhea with normal stools between diarrhea episodes. *Id.* Dr. Chang's notes indicate that the upper abdominal pain was associated with nausea and diarrhea. Tr. 309. Dr. Chang posited a variety of possible diagnoses and planned further tests. *Id.*

A January 2012 MRI showed diffuse dilatation of the common bile duct, with gradual tapering of the distal common bile duct to a more normal caliber at the level of the pancreatic head. Tr. 375-76. An underlying distal common bile duct stricture could not be excluded. *Id.* Plaintiff continued to experience abdominal pain, nausea, and bowel urgency. Tr. 345 (Feb. 2012 chart note referring to continued right upper quadrant pain); Tr. 348-49 (Feb. 2012 chart note referring to episode of rectal bleeding, sudden bowel urgency with fecal accident the prior weekend but no reoccurrence).

In April 2012, Plaintiff saw Dr. Amit Sadana, a gastroenterologist. Tr. 363-64. Dr.

Sadana noted Plaintiff's right upper quadrant abdominal discomfort, dilated common bile duct, upper abdominal pain, and diarrhea complaints. *Id.* Dr. Sadana reviewed several possible causes of Plaintiff's symptoms and expressed doubt that she had a retained common bile duct stone, but she could not be certain. Tr. 364. Dr. Sadana talked to Plaintiff about further testing to confirm the cause but those involved risks such as bleeding, infection, perforation, or need for emergency surgery. *Id.* Plaintiff did not want to undergo these types of procedures unless her condition was life-threatening. *Id.* Thus, further evaluation was deferred. *Id.* Plaintiff continued to report abdominal pain into 2014. Tr. 485.

While the abdominal pain may not be caused by her hepatitis C, the record shows that Plaintiff regularly complained about such pain. Her treatment providers noted some abnormal test results but have been unable to confirm a precise cause. More invasive testing carries significant risk. Given the overall record, the ALJ's finding that Plaintiff's complaints of abdominal pain are inconsistent with the treatment record is not supported by substantial evidence in the record.

As to fatigue, at the hearing, Plaintiff described experiencing fatigue as a condition that goes "up and down." Tr. 45. In explaining why she could not perform an "easy job" with a sit and stand option and lifting only a few pounds, she cited her "fatigue and pain" and the inability to be dependable because of the variability of her symptoms. Tr. 70. She explained that she does not sleep well because of shoulder and neck pain and thus, does not feel "restored" by sleep and "ready to face" her day. Tr. 71; *see also* Tr. 72 (explaining that she is tired and groggy because of her inability to get any good sleep).

The ALJ noted that Plaintiff reported feeling generally fatigued in November 2011, Tr. 18

(citing Tr. 312), but, the ALJ then cited a December 2011 record in which the practitioner noted that Plaintiff was feeling well in general. Tr. 18 (citing Tr. 341). The ALJ also found that Plaintiff made only intermittent reports of fatigue during her hepatitis C medication treatment and providers made no findings of notable fatigue. Tr. 18.

Chart notes show complaints in September 2012 of increased fatigue while undergoing the medication regimen for hepatitis C. Tr. 421 (Sept. 11, 2012 noting "[m]ore fatigue over the past 1-2 weeks"); Tr. 424-25 (Sept. 18, 2012 noting "fatigued" and commenting that hepatitis C medication may be contributing to her fatigue); Tr. 437 (Oct. 28, 2012 noting "still tired"). In October 2012, the side effects of her hepatitis C treatment included difficulty breathing, making it hard for her to walk more than 150 feet and qualifying her for a handicapped parking permit. Tr. 431. Additionally, the records of her hepatitis C medication treatment reflect a persistent anemia. *E.g.*, Tr. 422 (Sept. 11, 2012 chart note noting new anemia as a result of hepatitis C); Tr. 430 (Oct. 3, 2012 chart note referencing anemia); Tr. 431 (Oct. 6, 2012 chart note noting anemia); Tr. 437 (Oct. 26, 2012 chart note indicating reduced dose of medication because of anemia); Tr. 442 (Jan. 4, 2013 chart note noting anemia); Tr. 451 (Feb. 8, 2013 chart note indicating some improvement of anemia). Even after her medication treatment for hepatitis C was stopped in the spring of 2013 due to intolerable side effects, she continued to report fatigue. Tr. 472 (Oct. 2013 chart note); Tr. 476 (Dec. 2013 chart note stating that she becomes tired faster since her hepatitis C treatment and had not recovered to baseline "core strength").

The treatment record supports rather than contradicts Plaintiff's testimony that her fatigue goes up and down and is a variable condition. Consistent with her testimony, there are intermittent reports of fatigue. The record also does not support the ALJ's finding that there were

only intermittent reports of fatigue during her interferon treatment and no findings of notable fatigue. She regularly complained of fatigue and feeling tired during the treatment and she was diagnosed with anemia. Thus, the ALJ's finding that her allegations of fatigue are inconsistent with the treatment records, is not supported by the record.

C. Ability to Work with Impairments

The ALJ next concluded that Plaintiff had been able to work with most of her alleged impairments, undermining her allegations regarding her limitations, especially as to her musculoskeletal pain and hepatitis C. Tr. 18-19. The ALJ rejected Plaintiff's allegations that she survived in the workplace by taking extra breaks and missing many days of work. The ALJ found this to be inconsistent with the "demonstrated ability to earn wages in excess of the amounts indicative of substantial gainful activity" and the fact that she held one job for almost five years. Tr. 19.

In 2004, Plaintiff's DIB for the brachial plexus disorder was terminated because of improvement. Tr. 58, 63. Several months later, her husband died. Tr. 63. Thus, she went to work. *Id.* Plaintiff found work as a housekeeper. Beginning in 2006 and continuing until 2011, she earned between $12,000 and $22,000 per year. Tr. 49.

Plaintiff's first of two housecleaning jobs was in a facility caring for Alzheimer's patients. Tr. 63-64. She testified that even though she had brachial plexus disorder, she was scared of being homeless and had to work. Tr. 49; *see also* Tr. 64 (testifying that she was very committed to supporting her family at this point because her son was still young and she had once been homeless long ago and did not want to be homeless again). She coped by taking her pain medications and given the nature of the job, by hiding and taking breaks. *Id.* She sometimes

locked herself in the bathroom. *Id.* At other times she sat on the bed instead of making it. *Id.* She took all the pain medication she could and found ways to rest and stop during the day. Tr. 50. Eventually, however, after about two years, she was fired because she could not perform the job. Tr. 51; *see also id.* at 64-66 (testifying that she was terminated because she could not perform some tasks such as caregiving, that she missed a couple of days per month because of pain and fatigue, and that she was fired because she could not fulfill her duties).

After that, she found work as a housekeeper at a retirement home where residents have private apartments. Tr. 34, 66. She worked there from 2007 to 2011. She performed the work much more slowly than was required and missed time due to various ailments. Tr. 66-67. When asked how she managed to keep the job for so long before eventually being terminated, she explained that although her immediate boss would get angry with her, sometimes causing her to cry, the main boss was nice and knew she was trying. Tr. 68 (further testifying that she would tell her immediate boss that she would try to do better but noting that she really could not change anything about how she performed the cleaning job).

During the time she worked at the retirement home, before her alleged September 1, 2011 onset date, Plaintiff was paid disability insurance benefits several times for short-term disability leave. Tr. 178-93. She missed thirty-five days from April 15, 2009 to May 27, 2009, Tr. 191-92, followed by another eleven days from May 28, 2009 to June 7, 2009. Tr. 190-91. She missed forty-two days from December 13, 2009 to January 23, 2010. Tr. 188-89. And, she missed sixteen days from June 1, 2011 to June 23, 2011. Tr. 186-87.

Plaintiff argues that the ALJ misunderstood the disability insurance payments which, she contends, show that between 2009 and August 2011, she missed more than 150 days for

disability "documented by her employer, her physician, and an independent insurer[.]" Pl. Op. Mem. 19, ECF11. The ALJ ignored this evidence, according to Plaintiff, and failed to appreciate that the money she received was not for actually *working* but was because she was *disabled*.

Defendant contends that the absences for which short-term disability payments were made were not for any of Plaintiff's now-allegedly disabling impairments. Therefore, Defendant argues, the ALJ properly did not consider them relevant to whether Plaintiff could or could not adequately perform her job with her allegedly disabling impairments.

The short-term disability payment records contain no information regarding the nature of the disability. Tr. 178-93. Defendant notes Plaintiff's hearing testimony in which she explained that some of the short-term disability absences were related to falls. Tr. 76. She broke her arm twice and broke her tailbone. *Id.* She also had pneumonia a few times. *Id.* Based on these statements, Defendant argues that the short-term disability absences were not impairment related. Plaintiff responds by pointing to her testimony that her falls are related to her hepatitis C, one of the impairments the ALJ found to be severe. *Id.* (testifying that she falls a lot because hepatitis C makes her not feel good).

The burden at steps one through four of the sequential analysis is on the claimant. *Bustamante v. Massanari*, 262 F.3d 949, 953 (9th Cir. 2001). The credibility determination is used to formulate the RFC which occurs between steps three and four. Thus, the burden is on Plaintiff to show that the absences for which she received short-term disability payments between 2007 and September 1, 2011, were related to an alleged impairment. The record is ambiguous and there is no evidence in the record to support her testimony that her falls are caused by hepatitis C. Thus, I agree with Defendant that the short-term disability records are not relevant to

whether Plaintiff could or could not perform her job with her alleged impairments.

Nonetheless, I agree with Plaintiff that the ALJ improperly concluded that she successfully worked for several years with her conditions. First, Plaintiff was terminated from the first of the two jobs because she could not fulfill the job requirements. Given the basis for the termination, it is not reasonable to conclude that she successfully performed that job.

Second, the ALJ found Plaintiff's "nearly five year[]"[4] tenure at the second job to be inconsistent with the allegation that she could not consistently perform the work. He did not mention, however, Plaintiff's undisputed testimony that she performed the second job as long as she did before she was terminated, only because of a tolerant boss. Without any discussion of that testimony, the ALJ failed to meet his burden of providing a specific, clear and convincing reason to reject that testimony. Therefore, the ALJ erred by concluding that Plaintiff's symptom testimony was undermined by her ability to work as a housekeeper. Contrary to the ALJ's finding, the record does not establish that she successfully performed this work with her impairments. As such, it provides no basis to discredit her symptom testimony.

D. Activities of Daily Living

Finally, the ALJ found that Plaintiff's daily activities were inconsistent with her allegations. *Id.* He noted her ability to drive, use public transportation, grocery shop by herself, carry the bags to her car, attention to self-care, meal preparation, and a December 2011 report that she was walking daily for exercise. *Id.*

_____

[4] Plaintiff worked at the second job for less than four years, not nearly five years as the ALJ states. She was an employee there from November 5, 2007 to December 31, 2011, Tr. 225, but it is undisputed that she actually stopped working there in August 2011 due to her September 1, 2011 hernia surgery and that she never returned to work.

Plaintiff argues that the ALJ's recitation of Plaintiff's activities was out of context.  I agree.  In a 2014 case, the Ninth Circuit repeated its "warn[ing] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014).  Further, because "'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,'" the court has held that "'only if her level of activity were inconsistent with a claimant's claimed limitations would these activities have any bearing on her credibility.'"  *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)) (brackets omitted).

In *Garrison*, the court concluded that the ALJ mischaracterized the claimant's testimony when the claimant had emphasized that "in performing many daily tasks," she was assisted by her mother, that her pain regularly prohibited her from fully engaging in certain activities, and  that after performing such activities, she often must rest, leading her to nap several hours per day.  *Id.* at 1015-16.  The same error occurred here.  Although Plaintiff can drive, use public transportation, grocery shops, attends to self-care, prepares meals, and walks for exercise, she explained that there are limits to these activities.  Her son, for example, with whom she lives, does a lot of the housework.  Tr. 30.  Although she can drive, one of her kids typically will drive her if she needs to go somewhere.  *Id.*  She *sometimes* goes to the market to grocery by herself.  Tr. 54-55.  When she does, she shops for only five to twenty minutes. and she leans on the cart for support.  Tr. 55, 57.  She does not usually carry the bags out herself, but she can if it is not a long way and they are not heavy.  Tr. 55.  Her son or a neighbor brings them in for her.  *Id.*  She

prepares meals, but only for herself and makes things like sandwiches or frozen dinners on bad days. Tr. 55, 216. She can take public transportation when she has no one who can drive her where she needs to go, but it makes her anxious which increases her pain. *Id.*

Plaintiff also testified that if she does too much, such as sweeping the kitchen and washing the dishes, it increases her pain. Tr. 45; *see also* Tr. 217 (stating that it takes her a long time to do chores because she has to rest in between chores). She described fluctuations in her pain such that some days are better and she can move around, but then on other days, with "higher peaks of pain," she is more limited. Tr. 47. Some days she needs to rest in a recliner chair and may have to lay down with pillows because of her pain. Tr. 48. As noted earlier, she sleeps poorly because of her pain, requiring her to doze on and off during the day. Tr. 71-72.

Like the ALJ in *Garrison*, the ALJ here failed to acknowledge the manner in which Plaintiff can perform the noted activities and her inconsistent performance of many of them. Furthermore, like in *Garrison*, the activities as described by Plaintiff are not inconsistent with the pain-related impairments she described. Therefore, like in *Garrison*, the ALJ failed to give specific, clear and convincing reasons supported by substantial evidence in the record in support of his finding that Plaintiff's activities are inconsistent with her alleged limitations.

In summary on the credibility determination, while the ALJ's limited finding that Plaintiff's diarrhea-related symptoms are not supported by the treatment record is well-founded, the overall rejection of her credibility was in error. As a result, the ALJ erred in concluding that her subjective symptom limitations testimony was not credible.

II. Treating Physician's Opinions

Social security law recognizes three types of physicians: (1) treating, (2) examining, and

(3) nonexamining. *Garrison*, 759 F.3d at 1012. Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant. *Id.*; 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record. *Ghanim*, 763 F.3d at 1160-61.

If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *Id.* at 1161; *Orn*, 495 F.3d at 632-33. Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record. *Id.* at 1161; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Dr. Rowena Manalo, M.D., established a primary care treating relationship with Plaintiff in 2011. Tr. 387 (stating Dr. Manalo has been Plaintiff's primary care physician since September 2011). She was Plaintiff's treating physician at the time of Plaintiff's hearing before the ALJ and continuing thereafter. She saw Plaintiff at least eighteen times herself and additionally referred Plaintiff for blood tests, MRIs, specialty treatment for gastroenterology and hepatitis C, and

more. *E.g.*, Tr. 299, 302, 345, 366, 408, 410, 421, 431, 441, 449, 461, 472, 476, 479, 482, 485. She also administers Plaintiff's opiate therapy plan. *E.g.*. Tr. 345, 476, 482.

Dr. Manolo issued five opinions about Plaintiff's impairments. Tr. 386 (Sept. 9, 2012); 387-88 (Oct. 23, 2012); Tr. 391-96 (June 27, 2013); Tr. 558-62 (June 30, 2014); Tr. 563-65 (Oct. 13, 2014). The first is perfunctory and states only that based on Plaintiff's listed diagnoses, Dr. Manolo supported her request for medical disability. Tr. 386. The second contains some additional information about how long the treating relationship has existed and the focus of the treatment. Tr. 387-88. It also contains Dr. Manolo's opinion that because of her symptoms, Plaintiff can no longer work as a house cleaner at the residential facility where she had been employed. *Id.*

The other three opinions are more comprehensive. In June 2013, Dr. Manolo opined that during an eight-hour day, Plaintiff needed to rest at times in addition to a morning break, a lunch break, and an afternoon break in order to relieve her pain and fatigue. Tr. 391. She believed Plaintiff would need to rest four hours total in an eight-hour work day. *Id.* She assessed Plaintiff as having the ability to sit at one time for a maximum of fifteen minutes, with a total time of four hours in an eight-hour day. Tr. 391-92. She also assessed Plaintiff as having the ability to stand or walk continuously at one time for fifteen minutes, with a total time of one hour in an eight-hour day. Tr. 392. In her opinion, a cane, walker, or other assistive device is medically appropriate for Plaintiff. *Id.* Plaintiff also needed periods of walking during an eight-hour day, with the ability to work in one spot for only fifteen minutes before needing to walk for five minutes. *Id.* Plaintiff required a job allowing her to shift positions at will from sitting, standing, or walking. *Id.* Dr. Manolo also believed Plaintiff would need to take unscheduled breaks of ten

to fifteen minutes, every hour. Tr. 393. She further assessed Plaintiff as having the ability to occasionally lift up to five pounds but never lift anything heavier. *Id.* Dr. Manalo noted that sedation was a side effect of Plaintiff's medications and that chronic pain interfered with her movement. Tr. 395. She listed Plaintiff's diagnoses as chronic hepatitis C and chronic non-malignant pain in the upper extremities. Tr. 396. These conditions caused fatigue and affected Plaintiff's activities of daily living. *Id.*

One year later, in June 2014, Dr. Manolo completed another mental and physical health questionnaire. Tr. 558-62. She listed Plaintiff's chronic hepatitis C, chronic non-malignant pain, brachial plexus disorder, back pain, abdominal pain, and depression as her medically determinable physical and mental impairments. Tr. 558. She estimated that Plaintiff would miss four or more days of work each month due to her chronic pain, fatigue, and major depression. Tr. 559. As she had one year earlier, she opined that because of Plaintiff's pain and fatigue, Plaintiff required unscheduled breaks from productive activity in addition to a lunch and other scheduled fifteen minute breaks. *Id.* She would be unproductive for at least four hours during an eight-hour day. *Id.* In response to questions about how long Plaintiff could sit continuously at one time, sit cumulatively in an eight-hour shift, and stand and walk cumulatively in an eight-hour shift, Dr. Manalo opined that Plaintiff had no reliable ability in a full-time schedule. Tr. 560. She also had no reliable ability for lifting and carrying and various uses of her hands and arms. *Id.* Further, she would need to shift positions at will between sitting, standing, and walking. *Id.*

In her final opinion, issued in October 2014 and after the ALJ's opinion, Dr. Manalo stated that Plaintiff had participated in and complied with treatment, was not malingering, and

was not exaggerating or misrepresenting her symptoms. Tr. 563-64. She re-endorsed her June 2013 opinion as an accurate assessment of Plaintiff's ability to function on a regular and ongoing basis. Tr. 564. She concluded by stating that in her opinion, Plaintiff had been forthright and sincere regarding her subjective complaints. Tr. 565.

The ALJ gave "no weight" to Dr. Manolo's opinions. Tr. 19. He found that her medical records contained no objective findings consistent with her opinions which suggested that her opinions were based largely on Plaintiff's subjective report. *Id.* Thus, because the ALJ had already found Plaintiff's testimony not credible, he rejected Dr. Manolo's opinions.

As Plaintiff notes, Plaintiff's chief complaints are pain and intermittent fatigue which cannot be objectively measured. And, as was explained during the hearing, Dr. Manolo's assessment that Plaintiff had no reliable ability to sit, stand, etc., was based on the unpredictability of Plaintiff's symptoms and the fact that she vacillates between good days and bad days. Thus, Dr. Manolo's restrictions are consistent with the record. Finally, for the reasons stated above, the ALJ's credibility determination is not supportable. Thus, his basis for rejecting Dr. Manolo's opinions is equally not supportable.

## III. State Agency Physician Opinions

In formulating the RFC, the ALJ gave significant weight to the opinions of the state agency consulting physicians that Plaintiff could perform the full range of light work. Tr. 19 (citing Tr. 85-93; Tr. 95-104). These opinions included limitations prohibiting Plaintiff from ever climbing ladders, ropes, or scaffolds, and the need to avoid concentrated exposure to hazards such as machinery and heights. Tr. 90-92, 101-02. Plaintiff's opiate therapy was the reason given for these restrictions. *Id.*

25 - OPINION & ORDER

Although the ALJ adopted these opinions, he failed to include these specific restrictions in his hypothetical to the VE. Tr. 78-79. Vocational expert opinion evidence is reliable only if the hypothetical sets out all the limitations and restrictions of the particular claimant. *Bray v. Comm'r*, 554 F.3d 1219, 1228 (9th Cir. 2009); *see also Valentine*, 574 F.3d at 690 (hypothetical presented to the VE is derived from the RFC; to be valid, the hypothetical presented to the VE must incorporate all of a plaintiff's limitations). Here, because the ALJ relied on the VE testimony to support his step-five conclusion that Plaintiff could perform other jobs that exist in the economy, his failure to include all of the limitations assessed by the medical practitioners whose opinions he credited, was error.

Defendant argues that the error is harmless because both of the occupations identified by the VE require no climbing or exposure to hazards. The jobs, as cited by the ALJ in reliance on the VE testimony, are counter clerk, DOT 249.366-010, *available at* 1991 WL 672323, and furniture rental clerk. DOT 295.357-018, *available at*, 1991 WL 672589. Defendant is correct that both provide for no climbing. And, Defendant is correct that both descriptions state that "Moving Mech[anical] Parts: Not Present - Activity or condition does not exist." And, neither occupation requires exposure to atmospheric conditions, electric shock, high exposed places, radiation, explosives, toxic caustic chemicals, or other environmental conditions.

Plaintiff argues that the error is not harmless because hypothetical questions put to the VE must contain all of the claimant's limitations and it is inappropriate for the reviewing Court to supplant its judgment as to whether a specific functional limitation omitted from the hypothetical would have altered the VE's testimony. Furthermore, Plaintiff notes that the DOT number for the counter clerk position is specifically for a counter clerk in photofinishing whose duties include

loading and operating equipment that processes film. DOT 249.366-010. Defendant contends that because not all machinery is hazardous, this job requirement does not violate the job limitation given by the state agency physicians. Defendant points to Social Security Ruling (SSR) 85-15 for the proposition that recognized hazards include "dangerous moving machinery." SSR 85-15, *available at* 1985 WL 56857, at *8. Because the film machine does not, according to Defendant, fit this description, the ALJ's error was harmless.

I agree with Plaintiff that the error is not harmless. Notably, the state agency physician opinions are to "avoid concentrated exposure to hazards such as machinery and heights." The limitation is not restricted to hazardous machinery and it is written in such a way that any machinery could be considered a "hazard." The language does not clearly establish what exactly is meant by the word "machinery" or that it is concerned only with machinery that has dangerous moving parts. While that may be the case, it is not clear. The description of the limitation and the requirement that a person performing the photofinishing counter clerk position operate film processing equipment or machinery creates enough ambiguity that on this record, it cannot be determined that Plaintiff can actually perform the jobs with her limitations and thus, this error cannot be considered harmless.

IV. Consistency with the DOT

At step five, when the ALJ solicits testimony from the VE, the ALJ has an affirmative duty to verify that the testimony is consistent with the DOT. *Massachi*, 486 F.3d at 1152 (ALJ may not rely on VE testimony "regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the [DOT]") (citing SSR 00-4p, *available at* 2000 WL 1898704, at *2 ("At the hearings level, as part of the adjudicator's duty to fully develop the

record, the adjudicator will inquire, on the record, as to whether or not there is such a consistency")).

There is no dispute here that the ALJ did not obtain this testimony from the VE during the hearing. Defendant argues that the error is harmless because there is no conflict between the VE's testimony and the DOT. Plaintiff points to what she considers an obvious conflict: the counter clerk position requires occasional reaching and the ALJ's hypothetical to the VE, as well as the ALJ's RFC, prohibited all overhead reaching. Tr. 16 (RFC); Tr. 78 (hypothetical to VE); DOT 249-366.010 (listing occasional reaching as part of the position).

Defendant relies on *Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016), to argue that only an obvious or apparent conflict constitutes harmful error and, in Defendant's opinion, because there is no such conflict here, the ALJ's error is harmless. I disagree. *Gutierrez* is distinguishable. In that case, the ALJ asked the VE if his opinion was consistent with the description of a cashiering position set forth in the DOT and the VE confirmed it was. *Id.* at 807. The ALJ relied on the VE's opinion to conclude that the claimant could perform the cashier job which required frequent reaching even though the ALJ's hypothetical to the VE included a restriction that she could not lift her right arm above her shoulder. *Id.* The claimant argued that the ALJ erred by not asking the VE more specific questions regarding her ability to perform the cashiering job given the restriction on her right arm to no overhead reaching. *Id.* The court framed the question at issue as whether "*overhead* reaching is such a common and obvious part of cashiering that the ALJ should have recognized a conflict and questioned the expert more closely before concluding that [the claimant] could work as a cashier." *Id.*

The Ninth Circuit explained that for a difference between an expert's testimony and the

DOT's listing to be "fairly characterized" as in conflict, "it must be obvious or apparent." *Id.* at 808. The testimony "must be at odds" with the DOT's listing of job requirements that are "essential, integral, or expected." *Id.* Importantly, the court explained that "where the job itself is a familiar one - like cashiering - less scrutiny by the ALJ is required." *Id.* The court concluded that the ALJ did not err because even though "reaching" as defined by SSR 85-15 "connotes the ability to extend one's hands and arms in any direction," it was obvious to "anyone who's made a trip to the corner grocery store" that the typical cashier never has to reach overhead. *Id.* When the frequency or necessity of a task is unlikely or unforeseeable, the ALJ is not obligated to ask more specific questions about a conflict. *Id.* The court advised, however, that the requirement for the ALJ to ask follow-up questions is fact dependent. *Id.* In *Gutierrez*, the court determined that the facts did not trigger such questions and the ALJ was entitled to rely on the VE's "experience in job placement to account for a particular job's requirements." *Id.* at 809 (internal quotation marks omitted).

Unlike the ALJ here, the ALJ in *Gutierrez* asked the VE if the VE's opinion was consistent with the DOT. Thus, the Ninth Circuit's discussion of what constitutes a "conflict" occurred in an entirely different context than what is presented here. Here, because the ALJ failed to ask the VE if the VE's testimony was consistent with the DOT, the predicate for even inquiring about a "conflict" did not occur. Additionally, while anyone who has walked into a corner grocery may be able to observe whether a cashier frequently reaches overhead, the same cannot be said for a photofinishing counter clerk which is a more specific position. Unlike a cashier, the "job itself" is not familiar and thus, the record in this case does not support a conclusion that the ALJ's error is harmless.

Further, Plaintiff argues that the furniture rental clerk position requires a reasoning level inconsistent with "unskilled, repetitive, routine work" which the ALJ included in the hypothetical given to the VE and the RFC. The position identified by the VE is actually for a furniture-rental consultant, not a furniture-rental clerk. DOT 295-357-018. It requires Level 3 reasoning, defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Id.*

In *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015), the court held "that there is an apparent conflict between the [RFC] to perform simple, repetitive tasks, and the demands of Level 3 reasoning." The court concluded that the ALJ erred in finding that the claimant could perform a job requiring a level of reasoning inconsistent with the limitation. *Id.* However, the court went on to consider whether the error was harmless. The defendant argued that the claimant's previous success in school and his use of computers and video games established that he could perform the identified jobs. *Id.* at 848. The court, however, remarked that while the record showed he did well in math, it was in the context of a special education program and further, even if the court acknowledged the video game and computer evidence which the ALJ did not rely on, the record gave no indication of the extent or manner of the claimant's engagement with these pursuits. *Id.* As a result, the court could not determine on this "mixed record" whether substantial evidence supported the ALJ's determination that the claimant could perform the work and therefore, the ALJ's failure to reconcile the apparent conflict was not harmless. *Id.*

Defendant argues that the ALJ's error is harmless because unlike the claimant in *Zavalin*,

there is no indication that Plaintiff has ever been diagnosed with a cognitive impairment or learning disorder and she has a history of past work, including semi-skilled work. Plaintiff responds by noting that Defendant's reliance on Plaintiff's lack of a cognitive impairment and past work was not put forth by the ALJ who failed to ask questions of the VE about the apparent conflict because the ALJ failed to inquire whether the VE's testimony was consistent with the DOT in the first place. Plaintiff also cites to a recent Ninth Circuit decision with "remarkable similarities," Pl. Reply 16, ECF 13, to argue that the ALJ's error is not harmless.

I agree with Plaintiff. First, even if I were to consider facts in the record not cited by the ALJ on this issue, I note that Plaintiff has a very limited education having gone through only seventh grade, and that the majority if not all of her prior relevant work is as an unskilled housekeeper with low reasoning requirements.[5] Thus, like the claimant in *Zavalin*, the record here is similarly "mixed."

Second, although unpublished, a recent Ninth Circuit decision relied on *Zavalin* in holding that the ALJ erred at step five by finding that the claimant could perform the position of furniture rental consultant, the exact position at issue here, because it "requires a reasoning level of three, which is inconsistent with the ALJ's finding that [the claimant] could only perform simple, repetitive tasks." *Payan v. Colvin*, No. 14-16799, 2016 WL 7473791, at *1 (9th Cir. Dec. 29, 2016) (citing *Zavalin*, 778 F.3d at 847). *Payan* confirms that *Zavalin* should control here.

---

[5] The VE added that Plaintiff had work experience as a caregiver as well as a housekeeper with the caregiver position described as semi-skilled with a Significant Vocational Preparation (SVP) score of 3. Tr. 78. Plaintiff testified, however, that part of the reason she was terminated from the first of her two housekeeping positions was because she could not perform the job of caregiver.

The ALJ erred in failing to ask the VE if the VE's opinion regarding Plaintiff's ability to perform the photofinishing counter clerk or furniture rental consultant positions was consistent with the DOT. The error is not harmless because substantial evidence in the record does not unequivocally support a conclusion that Plaintiff can perform these positions.

V. Remand

In social security cases, remands may be for additional proceedings or for an award of benefits. *E.g., Garrison*, 759 F.3d at 1019 (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded[,]" but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test. *Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. *Id.* Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part must be satisfied. *Id.; see also Treichler*, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

All three parts of the test are satisfied here. First, the ALJ made several errors, including

failing to provide legally sufficient reasons for rejecting both Plaintiff's testimony and her treating physician's opinion. Second, the record establishes that no additional administrative proceedings are required. If the ALJ's only errors were in presenting the flawed hypothetical to the VE and in failing to ask if the VE's testimony was consistent with the DOT, remand for additional proceedings would be warranted because it is the VE in the first instance who should address the issue of the existence of jobs in the economy that Plaintiff can perform with her limitations. But, here, the VE testified that an employee who consistently misses two or more days per month, or is not productive on average four out of eight hours in an eight-hour work day, is precluded from gainful activity. Tr. 79-80. Considering this testimony and the record as a whole, substantial evidence supports Plaintiff's entitlement to benefits. While the state agency physicians' opinions conflict with those of Dr. Manolo, they cannot by themselves "constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). There is no other conflicting evidence in the record. Therefore, additional proceedings would not be helpful.

Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. Thus, remand for award of benefits is warranted. *See Flowers v. Colvin*, No. 6:15–cv-01591–SB, 2016 WL 807693, at *11 (D. Or. Feb. 11, 2016) (reversing and remanding for an award of benefits where the improperly discredited medical evidence included an opinion on absenteeism, and the VE testified that the estimated number of absences would preclude gainful employment).

/ / /

/ / /

33 - OPINION & ORDER

CONCLUSION

The Commissioner's decision is reversed and remanded for a determination of benefits.

IT IS SO ORDERED.

Dated this _____18_____ day of ____May_____, 2017

Marco A. Hernandez
United States District Judge